I want to welcome the students, assuming that you are here, from Temple Law School and also from Arcadia University. Hopefully those of you who were interested in the law when you came in will still be interested in the law when you go out. We'll see. First matter is Roarty v. Tyco. May it please the Court, good morning. My name is Mark Stevenson and I represent Appellant Life Insurance Company of North America, a significant insurance company. And I'm reserving three minutes of my time. Mr. Stevenson, let me ask you, is it your position that the accidental death benefit here, the accident policy, never vests under any condition? Or is that overstating your position? I think that overstates my position. Okay, what is your position as to vesting? The potential eligibility vests, the language can no longer change upon the loss. That's to say when the person dies. Okay, so in August of 2004, after the accident, at whatever point in time after the accident, Mr. Roarty died, at that point in time, you're saying the eligibility vested could not be taken away? You could not retroactively amend the program? Yes. You could not have amended the plan on the 10th to change its terms back on the 4th. Even though the SPD and the plan suggest that at any point in time you can rescind, change, or terminate? But I would suggest that that language is intended to be that as of any given day, the plan could change its terms and become new terms. You could not go back, for example, and say that over the last six months, if you thought you had a benefit, well, you didn't. You changed the terms. But you do reserve the right, and maybe I'm wrong, to rescind retroactively, don't you? It is my recollection that that is not part of the line of policy. Okay. And I could be wrong on that. I'm going from recollection. Frankly, I've never seen it happen. Okay. But in any event, as of the time Mr. Roarty died, you're saying the interest that he had, whatever that is, under the ERISA plan was vested insofar as it could not be rescinded at that point? You had to pay out whatever death benefit he was eligible for under whatever SPD or plan controlled at that point? To be responsive, the answer is yes. But I would go further and say it this way, that as of the date of Mr. Roarty's death, as to his claim, the terms of the plan could not change. Now, what those terms are is in debate. But those terms could no longer be changed as to his claim. Okay. There's an argument over what documents control and define the terms of the plan. Okay. May I proceed with the argument? Sure. I may have to say I'm a graduate of Temple Law School, so kind of I have somebody looking over my shoulder. And when he's done, let him know how he did. All right. Lina has a very limited role in this case. Lina's conduct is not at issue in this case because Lina's conduct relates to the handling of the claim. Judge Sleet did not reach the handling of the claim and did not resolve the 502A1B claim. This case deals very much with the distribution of a summary plan description and summary material modification in 2002. So that Lina's liability here is also highly limited. The policy, the summary plan description of 2002 gave indication that there would be a change in the terms of this plan. And the summary of material modification of the same time period said that the Lina policy would become the plan document. All right, but that's the tree that fell in the forest that nobody heard. It said that, but that was never communicated. Well, no. Judge Sleet said that it was not communicated to the people in this one subsidiary of a 250,000-person company. Okay, but that's what we're talking about. That's what we're talking about. Yes, but this is important because there's a part of this case that is about the rorties. There's another part of this case that's about the relationship between Lina and Typo and who is liable for the payment. And before we come to the merits of Judge Sleet's decision. Well, that's true. That's true. The questions I'm asking you, I should ask Mr. Christina as to the underlying liability. Well, I'll talk about that. All right. I just want to make very clear here that if you apply those, that summary plan description, that 2002 summary plan description, and summary of material modification were not invalidated, they were held not to be effective as to Mrs. Rorty. But as to the plan itself, they were not invalidated by Judge Sleet. Okay. The amendments were not invalidated. Is that the difference between this case and Ackerman? Yes. Where the issue was striking? In part, yes. That is a major point. This and Ackerman is a major difference. Okay. Well, if that's the major difference, then why wouldn't there still be a claim under Burstein? If the primary difference here is the fact that the plan amendment, you're not trying to strike the plan amendment. They're just trying to get benefits under the plan as communicated in the last SBD that they got, then why doesn't Burstein control? I'm not that far yet. I'm just on the simple question of who can be ordered to pay. Judge Sleet simply assumed that Leina was liable. There's no discussion of how he gets to that point. If you read the controlling plan document, which is the Leina policy, and is effective to the plan itself, then Leina is not required to pay any benefit not provided by its policy. So is the best you can hope for in this case vacating the decision and sending it back for a hearing on whether it's arbitrary and capricious? Well, this case can go one or two ways. For whatever reasons this court deems appropriate, it may decide that Judge Sleet correctly determined that a substantive remedy was available. That's a choice. And you don't care about that as long as you don't pay? Well, under the terms of the – Kennedy dictates that the written plan's terms are to be enforced. The written terms provide that Leina is not liable to pay any benefit not provided under its policy. And one thing's clear in Judge Sleet's decision. Leina's policy is not at issue. He was looking to other language. If your honors go in that direction, then we address who's liable for payment. And I suggest to your honors that it's really pretty clear that Leina cannot be held liable. If this court comes to the conclusion that this is an ERISA disclosure violation, the court clearly found a violation occurred, then it has the decision of whether extraordinary circumstances were established that would allow a substantive remedy to have been imposed. In Judge Sleet's decision, we can get into that in a moment. The matter would then be returned for a resolution. It's entirely possible that Mrs. Rorty is entitled to a benefit here. We never got to that question on the merits of the claim and the merits of the claim handling. And if you look at the arguments of bad faith that Plaintiff Eppley raises, they're almost entirely directed to the handling of the claim. They would be procedural regularities under Schwinn. So with those thoughts in mind, those are the choices the court has. Let me address – I've said as much, I think, as I need to say about Leina's position in this case. If you look at this case, you have a large company running a large plan that prepares a summary plan description and a summary material modification. Judge Sleet had no trouble that they had, in fact, been prepared and they were put into the record. Judge Sleet had no trouble that they were mailed. What was – because Tyco could not establish and meet the standards of the regulation on distribution, which would have allowed a presumption of distribution to Mrs. Rorty and her testimony that she didn't get it, he was well entitled to go fine that as to that particular distribution, a violation had occurred, the one going to her. And he extended that to say because of the other employee who had testified. Violation of what? The notice or disclosure requirements? No, the disclosure – the requirements in Arrested to Disclose, a summary plan description at least every five years to issue a summary or material modification within the date lines. You can make that argument and it's hard to argue against it. But those were, in the parlance of this Court, a mere disclosure violation. I call it a bare disclosure violation because it is not attended by other conduct. Congress created a remedy for disclosure violations upon written request. Let me ask this. Between the two of you, where does the record now stand in terms of what Judge Sleet did? Is it joint in several – that's the entire 500,000? I would assume he didn't say that. He just directed the defendants to pay. So we could remand it and ask Judge Sleet to figure out, let you two guys duke it out, if you will, in the parlance of South Philadelphia and determine who pays what. Or contrary – can I jump in? Sure, sure. Or contrarily, is there enough in the plan document that says Lina, regardless, doesn't have to pay? Yes. Lina would be entitled to disclose. Okay. So we could remand, if we were to get to that point. We could remand and let Judge Sleet decide that question. But you're saying there's enough in here that just by looking at the plan, we can say. Yes. I mean, there's no need for this case to be reviewed and reviewed. But to go back to the disclosure violation issue, Congress created a statutory remedy when there's a written request for disclosure that's not met. And that's a 502A1A case. And that's not this case. And that's not this case, and it was not claimed below. Using – filling in the gaps of ERISA, this court has created a common law remedial scheme. If it's an inadvertent disclosure, we'll then fix it and give them what they're entitled to. But there's no penalty attached to that. Well, then the issue is what are they entitled to? And I'm not sure that your colleague is going to agree with the answer to that question. If – for there to be a substantive remedy arising out of the failure of disclosure, you have to show extraordinary circumstances. Lettrich, that's the one where they hide it in the middle of a 62-page document. Ackerman is where they don't tell the people in this one facility when they tell everybody else. Yeah, but I'm not sure we have to get to the issue of extraordinary circumstances under the disclosure violation. Why isn't this just a pure and simple Burstein approach where there's no issue – no need to prove reliance, no need to prove anything about the disclosure? It's simply a case that the 2000 plan controls because it could not be modified by a substantive change that was never communicated. Then why isn't it that simple? And why is it that complicated? There was a substantive change. It was communicated. It may not be operative. There was a substantive change. Right. The substantive actual change is in the summary of material modification. Don't be picky about it. It was communicated to the – generally to the corporation judged to sleep. Did not find otherwise. No, I understand all that. I understand all that and I understand where you're going because of your limited – potentially limited interest here. But it does seem to me that it's different than the – we can look at this in a way that's very different from the way you want us to focus on. I understand why you want us to focus on it because you don't come into this case until after the plan was changed and the company was sold to Tyco. But I'm not sure if we just look at Burstein and how it could be applied here. I don't know why this isn't any simpler than whether or not the terms of the 2000 summary plan and plan under which he clearly would have been covered still control because there was no operative communication to him of any change and the way we view the importance of summary plan descriptions conclude that if the summary plan description was not communicated to him, we're under the 2000 plan. Now, that may or may not answer your question because it may mean you're out of it because you're not in it in 2000. It may mean that your friend has a problem. I don't know why it's not that simple. It leaves you with the question of reconciling these two general principles. You have Jordanair that holds the position, that takes the position, then an inadvertent disclosure violation does not give a substantive remedy. Burstein was a case in which… Well, the substantive remedy, though, is striking the amendment, and that's not what we're talking about. The cases that have talked about a disclosure violation absent extraordinary circumstances, which I assume we don't have here because Greg Sleet didn't find any, they talk about the remedy being striking the amendment, but we're not that far. You don't have to go that far here. It's not a question of striking the amendment. It's just from a matter of federal common law of contracts, what is the relationship and what are the obligations between Mrs. Rorty and Mr. Rorty and the plan? I would suggest it's effectively striking the amendment because you have the amendment out there. No, because you would agree that it applies to everybody else. To every other person. Well, you would agree that it applies to everybody else, though, wouldn't you? So you're not striking the amendment. The amendment is still perfectly operative as to everyone who received it. I'm striking it as to appellees. Well, you're making it non-operative. You're saying that as to the person who didn't receive notice of what they were bound to. They're not bound to it. They're bound by the 2000 plan documents. But you're not striking the amendment. It is different than the Ackerman scenario. I can appreciate the difference. I don't know that it still leaves you with the question at this point of whether a failure to deliver a summary plan description inadvertently. Well, let's put it another way. Congress has genuinely not required perfection in the administration of a plan. This is a 250,000-person plan, and they missed somebody. So the question then becomes, do you burden the plan because they missed someone? Well, why is it burdening the plan to make the plan, whichever plan it may be, pay what they're obligated, what they're constructively obligated to pay? Is it a burden to ask them to do that which they agreed to do? Is that a burden? You're saying pay? No, it's clearly not a burden to require them to adhere to the law. But the law does allow for some reasonableness there. So while we're talking a big plan here, this law would apply just as easily to a small plan. Let's say a small self-funded health care plan, and somebody gets missed. That can be the difference between that plan surviving and not surviving. Well, but if the person doesn't get missed, that argument makes absolutely no sense. Let's assume that the person doesn't get missed. The person dies and they're covered under the plan. The play out for the plan is exactly the same. We're not talking about imposing a punitive penalty here. We're simply asking the plan to do what it's constructively obligated to do, and you're saying that that's burdensome. Well, maybe it's burdensome, but that's what the contract requires. I respectfully disagree. If you take a look at the company, let's look at how this would play out down the road a little bit if Your Honor's view became the view of the court. You have that small employer, 500 lives, 300 lives, self-funded plan, and they're becoming increasingly more common. And the plan has been amended to reduce levels of coverage because the economics require that to happen. That employer now will have insurance at some level, but it will be paying out of pocket. When we make that change and someone doesn't get communicated, there's no funds now to pay that old benefit. That's going to have to come out of some pocket. Generally speaking, as an employer, the more severe that damage, the conclusion is, well, why am I sponsoring this plan? Well, I understand that's a possible problem, and that is a real problem. Should the burden then be placed on the person who builds their life insurance portfolio based upon the assumption that they don't have to go buy more life insurance because they're covered 24-7 from a $500,000 policy? Should that person pay the burden because the company screws up and doesn't give them notice? There is always some inequities in the allocations of burdens. Some of them land on the oversight of the administrator, clearly. I don't have answers for all of that. I think that the only response that you can come to is when you're looking at incentivizing employers to maintain benefits in difficult times, in allocating out the respective responsibilities back and forth, and accepting that we're not going to require perfection. What are the consequences of not being perfect? The remedy in the result is not to give someone a more convenient set of plan terms. Let's say, okay, as of the date of the loss, what would you have gotten? More convenient than what? More convenient than the plan that they would have been obligated to be paid under anyhow? You're positing this as though she's clearly not entitled to the 2000 plan, and therefore giving her anything other than the new plan is eye-burdensome or putting her in an advantageous position. But I'm not sure that's accurate if the 2000 plan is the one that's operative. And that's the issue. That is the issue. But the argument I'm making is that in terms of the administration of a plan generally and not necessarily specifically tied to these facts, since this is something of a policy argument. When we open up that discussion, when does the benefit best? The best on the day of death, okay? And everybody sitting in that plan is tied to the same rule, and the administrator is running on the same rule. Plans are underwritten on that kind of a rule. I understand that there can be adverse consequences, which were not proved in this case, by the way. Back up. What adverse consequences were not proved? There was no specific testimony that other than not getting the benefit of the terms of the 2000 plan, and perhaps they make it more likely that she was covered. Okay. There's no reliance. But there's no reliance. We canceled three life insurance policies because we didn't need them anymore. But under Burstein, there doesn't have to be reliance. I understand that. But at the policy level, what are we trading off on balancing here? Can I ask you a question? Judge McKee referred to before the lack of a finding on extraordinary circumstances. Was that something Judge Sleet considered? He had to consider it. It was discussed by the parties, and it's in all the cases he said. But he made no finding on it at all either way. Well, yeah, he did. Because if you take a look in the footnote, he comments that there's no reason why in the record this occurred and surmises that it looks like it was an administrative error of this small group in a very large company recently acquired. He does not specifically say, as some cases have, I find or I do not find extraordinary circumstances, but you can't reconcile that footnote any other way in the terms of the case. So how does that work into your analysis of the notice issue, where there's a remedy for failure to notify? The remedy of failure to notify. In this context, and context is everything in this case. Yes. In a very large plan where there's no reason to think that most people didn't get it and let's say all the employees of this Scott subsidiary were overlooked. Right. Then the remedy is that they all get their notice. They all have to be re-notified, re-sent their stuff. A new summary plan description has to go out to those folks and they have to get on board and there have to be meetings, whatever. You fix the defect so that everybody's on board. Okay. But it does not necessarily mean that they're not bound by the terms of that plan. So what about this case then? I think that's essentially where we are. We've gone quite a bit over. Let's hear from Mr. Christina. You do reserve some time, I think. A few minutes. If the court please, my name is Tom Christina. I have the honor of representing the Tyco International Limited business travel accident plan in this case. And do you agree with Mr. Stevenson's statement, our discussion about when this vested? I did. In fact, I wanted to say I'm going to, with your permission, depart from my prepared remarks and go straight to the questions that you asked. Okay. The principle one being why isn't this case just a variation on the first? It's very simple, it seems to me, on the face of it. I think there is an important distinction. In Burstein, the summary plan description was a summary plan description that purported to describe the plan actually in effect at the time. In this case, what we're dealing with is a summary plan description from a previous plan that was not, I mean it couldn't have been intended to represent the 2002 plan because it was written in 2000. Now there is a certain logic to holding a company to an inaccurate description when everyone knows that they're trying to describe the plan that's really in force. As the court knows, we do take the position that Burstein is out of step with other decisions of this court. We're bound by Burstein. But there is an internal logic to that. That logic is missing here. In this case, without any finding of detrimental reliance or extraordinary circumstances, an old SPD is being revived as though it were still in operation to become the terms of a plan. Where that logic would lead is that although Congress gave plan administrators 210 days after the end of the plan year in which the amendment is adopted or takes effect, whichever happens first, to publish the summary of material modifications, under the decision here, if a company took its full 210 days, during that period its amendment wouldn't be effective because the old summary plan description would have been the last one that anyone got. And we believe that the statute just won't support that. Well, that's the problem. But as Mr. Stevenson said, it's not a perfect, it'll surprise everyone probably to learn that Congress did not draft a perfect statute here. It's true that it is not a perfect statute, but it is actually very carefully drafted. And when Congress wanted to make the effect of an amendment hinge on notice, it knew how to do so because it did that in Section 204. Yeah, but then we've got Burstein. So your argument is a sound argument. We have to interpret it in light of our controlling cases, and it does seem to me that this is not an Ackerman scenario for the same reasons that I discussed with Mr. Stevenson. We haven't conferred up here, but I would be amazed if a majority of my colleagues wanted to take the position that in a scenario like this, the absence of notice meant that there are no benefits, even though the benefits that were last described in a summary plan document were benefits that are substantially greater than and probably more than she thought she was going to get. And the only reason that the person is not covered is because of a screw-up, not on the part of the employee, but on the part of either the company or the plan or the person the plan hired to send out the notices. Now, why should the beneficiary's estate take the hit for that? You think Congress intended that result under ERISA? Yes, I do. I think Congress clearly had to make some compromises in 1974 when ERISA was adopted. And the Supreme Court has said on two occasions that one of the compromises was that since Congress decided that we're going to stick with a system of voluntary employer-adopted plans, there were going to have to be some safeguards so that a company knew that it wasn't exposing itself to huge liabilities for relatively small mistakes. And so I do think that that's what Congress intended. Now, I also think that this Court has, in cases where there's detrimental reliance or extraordinary circumstances, worked out a jurisprudence that covers the types of cases you're on. Yeah, but in those cases, the burden to the company is exactly the same. If there's a reliance or extraordinary circumstances under Ackerman or no extraordinary circumstances or reliance under Bernstein, but just the common law of contracts giving rise to a right of enforcement, the burden on the company is exactly the same. As I said to Mr. Stevenson, we're not talking punitive damages because they didn't send out the notices. If that were the case, I think your argument would hold some weight. If the burden is exactly the same, why shouldn't the Bernstein result appear to apply here? I think the answer is that although the burden is exactly the same, and so in a perfect world, everyone would get their summary of material modifications issued immediately, the consequences of the failure are different. In the type of situation your Honor posited, where a person actually sat down and planned out their life insurance arrangements based on a disclosure document, but that's not this case. There was no finding of that kind here. No, and that would give you – then you'd really be in the soup under Ackerman and Bernstein. I don't think we'd even be here. You wouldn't be here. I would hope that you wouldn't be here. But I'm not sure you have to go that far because we said that you don't need reliance where you have a summary plan description that is inaccurate, even though there's a disclaimer built into the summary plan description. And it seems to me – it may be that the case is just that simple. It begins and ends there. I notice that my time has expired. Go ahead. But if I may, Your Honor, that was the next point I was going to make regarding distinguishing Bernstein, which is that, as the Court subsequently said and proven, if I'm not butchering the name, it is especially the case that where a summary plan description explicitly says the official plan document controls, then in the absence of extraordinary circumstances or detrimental reliance, there isn't a substantive remedy in the form of benefits associated with a disclosure violation. But again, the substantive remedy via the benefits came by striking the amendment. That's really not what's at issue here. You can argue that the result is the same, but that's not the relief that they're asking for. The amendment is still sitting out there. It's operative. It's to everybody, perhaps, except for Mr. and Mrs. Rorty. That's true, Your Honor. But that itself, I think, lies in the face of what Congress intended because one of the other purposes of ERISA was to simplify plan administration by making it uniform, including uniform nationally. That's why there's preemption. And in the situation that the District Court created here, if there were some screw-up and one subsidiary didn't get a summary plan description, then the plan administrator would be forced to administer the plan differently with respect to one population versus another. Well, Congress has decided, Bruce Dean, in 2003, Congress in its infinite wisdom has not seen fit to step in and tell us we were wrong by amending ERISA in such a way that it would take care of that gap that this case falls into. And it is controlling precedent. As the Court knows from our brief, we think it's actually an aberration in the context of other Third Circuit cases. But if it's a binding aberration, it doesn't mind how aberrant it is unless we go en banc. I can't disagree with you on the Third Circuit's internal operating procedures. But it does seem to me that Hooven is also binding, and Hooven purported to limit Burstein to its precise facts. Right, but Hooven is weird because that's a situation where there was really no cessation of employment. I mean, there was an issue about getting benefits for jobs that really were never lost. So that's kind of, when I talk about aberrations, that's kind of, it's a different kind of case. And it's maybe a bit of a strain to take the law that arises out of employees who never lost their employment, who are suing for benefits that only accrue if they lost employment, and then bootstrap that into a modification of Burstein. Perhaps, although it's the same section of ERISA. It's 502A1B, which allows an action for benefits or an action to establish a future right to benefits. Right. But thank you very much, Your Honors. Thank you. Ms. Allen? Ms. Allen. May it please the Court, Michelle Allen. I've always wondered, what happens if it doesn't please the Court? I always wonder, what happens if we say it doesn't please us? I sit down like that. Okay, all right. And you never really know if it pleases us or not. We'll say it pleases it so she can continue. Okay, it pleases. It just tickles our fancy. Michelle Allen on behalf of Kelly Rorty, the appellee. Your Honor is exactly right. This is the simple case of Burstein. And Judge Sleet was absolutely correct that Ms. Rorty is entitled to the substantive benefits under the 2000 SBD because that was the last SBD in effect at the time of Mr. Rorty's death. What about Mr. Stevenson's argument? It's an argument of some substance that in all the cases the SBD that controlled related to the same underlying plan. You've got a situation where a subsequent plan that this SBD doesn't relate to would have to come in and we'd be relying upon an SBD to provide benefits and the plan that it would arguably have to relate to wasn't even in existence. It's a totally different plan. Why isn't that a problem for you? Except for the fact, Your Honor, and this is in Judge Sleet's opinion, that although he did not find that the defendants presented any credible evidence that the 2002 SBD or SMM in that matter were ever distributed or ever mailed or ever sent to anyone, particularly at the Scott Instruments facility, the 2000 and the 2002 SBD are identical. And we submit to the Court that at the time the 2000... Well, the plan's not identical, though, and the plan administrator's different. But that's exactly right. The plans are not identical. You have a 2000 plan that allows 24-7 coverage. Then you have Lina's plan, which their plan document says that it's only covered on business travel accidents. They were not required under ERISA to submit a new SBD, but they did do a new SBD. They did a 2002 SBD. And in that 2002 SBD, even though they knew that their plan did not say that it would be covered 24-7, their SBD that they sent and produced and published in 2002 said that it would be covered 24-7. Do you want us to write an opinion that encourages employers not to issue SBDs because there's additional risk when you do it? No, I think that SBDs absolutely should be required, and they should be required for the reason that Congress said, that you have a plan, which is this voluminous document, and there needs to be some sort of summary for the employee to know what they're entitled to. In Mr. Stevenson's argument, and I think Mr. Christine's is too, if there is a mistake, say a scrivener's error like we have in one of the cases, in the SBD, should the consequences of that clerical error, if it is a clerical error, rise to that level that the employer is penalized and we expect that kind of protection? And if it's a large plan, what does that mean long-term for the likelihood of employers being willing to offer these kinds of plans? That's exactly the verse Dean held, though, that Congress is giving the participants of the plan the benefit that that is what they are relying upon, that that is their summary, and it is the employer's responsibility to make sure that that's an accurate summary that can be easily understood by the plan participants. And I absolutely think it's the employer's obligation to ensure that there isn't a conflict. And we're not just talking about a clerical conflict, we're talking about a very material conflict. A summary plan description says, whenever you travel in business, due to the level of your management with this company, you're covered 24-7. You don't need to take any additional coverage. Essentially, you have a $500,000 benefit that will cover you no matter what. And then you have a plan that is in direct conflict with that that says, well, no, you're only covered during business travel. Yeah, but if you could show that she relied upon this or that Mr. Rory relied upon it, again, it would be very easy. If Mr. Stevens said, we wouldn't be here, that would be the extenuating circumstances under Ackerman, and you'd be home free under either doctrine. We don't have that. Well, to be honest, I would submit to you that we do have that. I think that the evidence clearly, the unfortunate circumstance, obviously with this case is we didn't get to take the testimony of Dan Rorty because he's deceased. And he, of course, relied on it because he gets into this issue as to initially where the case started was, was he or was he not on business travel at the time? We submit that regardless of whether he was on business travel at the time. So you're saying we should assume reliance whenever there's a detrimental change, a change that's detrimental to the employee, that we should automatically infer reliance coming out of that, that they knew about, that had they known about that decrease in benefits, they would have done something in response? In a situation such as this where we're talking about someone who believes that they have this $500,000 coverage and it covers them all the time, I think that it's logical to assume that if he was aware of the fact that he was – and he has two reliance issues. If he was aware of the fact that he was not covered, he would have sought to get additional coverage. Secondly, he would have taken – if he knew you have to have this very specific documentation that shows that you're on a business trip, whether it had to be signed off by a supervisor. And remember, there were no policies and procedures that got instruments because nobody that's got instruments knew that you weren't covered 24-7. The head of their HR department thought that they were covered 24-7. Mr. Rorty's first-line supervisor, Mr. Bob Brzezinski, thought that they were covered 24-7. The records are clear on all that, but is there any precedent supporting what I think you're arguing is a presumption that he relied on it, though he can't obviously testify about it now? I'm not aware of any clear case precedent that I can point to at this point with respect to that. I think that the evidence, however, clearly supports the fact that he relied on it and he would have taken these additional steps to ensure that it was covered on this business trip. Well, then if you're right, there's nothing left of Ackerman because whenever you have a situation like this, there are always extenuating or extraordinary circumstances. With the reliance that we said in Burstein is not necessary, you're saying it's not necessary because it's always there. The other thing it seems to me you're asking us to do is to take an action which is tantamount to striking the plan amendment. That's a lot more difficult to prevail on, I think, than just simply saying that you should recover under the 2000 plan because of the SPD not being or the SMM not being communicated. If we go as far as striking a plan amendment, then you are in pretty serious tension with Ackerman that says we don't get that kind of relief based upon a failure to disclose or give notice. Yes, Your Honor. Our first argument is clear that this falls under the Burstein ruling and that you have a SPD, whether it's the – and I am aware the Judge Smith found that it was the 2000 SPD in effect, but whether it's the 2000 or the 2002 SPD. And recall that the 2002 SPD is an SPD that is created by Linus, so it's not the situation where you're talking about another carrier. That 2002 SPD was a summary of the policy that we are here before, and that was a direct – Wait, Lina created the 2000 SPD? Excuse me, Lina did not create the 2002 SPD. Okay, it was Signet. Correct. It was the 2002 SPD that summarizes the Lina plan. Okay. And we would submit to Your Honors that that is still in direct conflict with the plan, so we don't need to get to Ackerman into it being a disclosure violation. But in the event that this Court does that, I think that the evidence absolutely supports the fact that there were extraordinary circumstances. How could we get – how could we resolve it without determining that there was a disclosure violation? By holding it under a simple Burstein ruling in the fact that the 2000 and the 2002 SPD were in direct conflict with the plan and that Mr. Rardy is entitled to rely on, in this case, the 2000 SPD because that was the last SPD that he had received. But even if he had – That to me sounds like a disclosure violation. And you're also bootstrapping reliance into the argument, which is – at least I have some discomfort with doing that because there's nothing on the record to suggest reliance. And if we write our opinion in such a way as to build reliance into the analysis, then out of that comes a body of jurisprudence which in the future infers reliance from any situation like this. And then we really are down a road which is pretty untenable, it seems to me, because we're a subsolicio eliminating the jurisprudence that comes out of Ackerman. We're saying you don't really need to show reliance anymore. We're going to find it from the very fact that the person didn't receive notice. So the failure to give notice and the finding of reliance conflate and Ackerman – we've just reversed Ackerman. That's the result of that opinion, the one you're asking us to write. My colleagues aren't going to be happy about that. Your Honor, I'm not asking this Court to do that. What I submit to Your Honors is the fact is that I do not think that if we hold, in this case, reliance, that it will then have to hold in every case reliance. Well, how could we not? Unless you specifically asked the person and you couldn't because in a tragic case like this, the person that you need to ask the question of most is not there to answer it. There may be somebody else in the household who could answer that question, and that would be a pretty impeachable response, it seems to me. I don't know how much probative value it would have. How could you not find reliance in every single case? I think it's more than reliance in this case, Your Honor. It also goes to the fact it was their act of concealment. And due to their act of concealment was Mr. Rorty's. Where in the world on this record are you getting act of concealment? The act of concealment comes from the fact that they absolutely took no steps whatsoever to mail the... Well, they hired this company, Reliazon, which is the ultimate irony in terms of their names, like who would rely upon them after this, to mail out these notices. At least Mr. Rorty and Mrs. Rorty didn't get notice, and you're suggesting that nobody at Scott Instruments got notice. I'm not sure the record supports that. But even if you're right, if they go out and hire somebody to send out notices, how can you then suggest that we could find they actively concealed the notices, that they were trying to send out notices? In particular, footnote 3 is pretty specific. It's not apparent from the record why they didn't go out. So it's clearly you didn't make any findings in that respect. He does say he doesn't know why they didn't go out. But furthermore, there was an e-mail from the HR director that states that the SPD was never updated and to just go ahead and make a change after the employee died, which we submit also furthers their act of concealment in this case, in that because they made no efforts to submit the SPD or the SMF, and it wasn't just so much that they didn't go ahead and mail it. They presented no evidence whatsoever, particularly with the SMM, that they didn't even talk about whether or not they said that what the general procedures of TYCO would be. They did not discuss what was actually done in that particular case with this MMM in this case. Did Judge Sleet apply the Ackerman case? I mean, he didn't make a finding about extraordinary circumstances, did he? He did not specifically state with extraordinary circumstances. He relied on the Burstein ruling. And I would just to go over some of the points that was raised, although it was not raised in argument, was raised in the reply brief from TYCO, the plant, that they stated that they can't be held liable because it was TYCO, the employee, who was responsible for submitting the SMM and the SPD. And I would just submit to Your Honors that in their conclusion of law, in paragraphs 32 and 44, they do submit that it was the plant who was responsible for distributing the SPD and the SMMs. As that came in the reply brief, I wanted to address that with the Court. What's your position? Maybe probably not the best one to answer. I guess the answer is you don't care. If your words prevail, it seems to me there are very different arguments to be made as to whether or not Mr. Stevenson's client or Mr. Christina's client should be on the hook for that. Would your suggestion be just let Judge Sleet, Chief Judge Sleet, figure that all out? Or that we could look at the documents, the plan, and conclude as a matter of law who should be on the hook for it? Your Honor, if we follow Judge Sleet's ruling, I believe in following Burstein, which we agree absolutely applies in this case, then the 2000 SPD would sort of be subsumed into and amend the plan. He did not invalidate, Judge Sleet did not invalidate the 2002 plan, and then we would argue that lineup would be responsible to have to pay into that. But clearly if it weren't for— Even though Signe is the plant administrator on the 2000 plan? I believe it was AIG, Your Honor, on the 2000 plan. Okay. You still have a little bit of time. You don't have to take it. Anything else you wanted to say? That might please the Court if you did. That would please the Court. And I have nothing further. Okay. I didn't mean that. Yes, he actually did. Okay. Appley conflates Leina's role. Leina was not the plant administrator. The plant administrator is a very different creature under ERISA and has all the disclosure obligations. Leina was the claims fiduciary. It was responsible to review and decide the claim. It did not prepare summary plan descriptions. Plant administrators prepared that. In fact— And who was the plant administrator? It would have been Tyco. I believe, Mr. Krishnan, I believe it was Tyco on behalf of the plan. The SPDs are not identical. The 2000 SPD describes the benefits of the plan as they were provided under an AIG policy. The 2002 SPD does the same thing regarding the benefits but includes in parentheses the note that this is subject to changes of July 1, 2002. That ties into the summary of material modifications which states what the amendments will be and identifies the line of policy. Appears to have been a printing problem and that's how they decided to solve it. And that's how the line of policy becomes the controlling plan document under this plan. I agree that Ackerman is rendered superfluous. Plaintiff's arguments for extraordinary circumstances on this record are both circular and essentially turn every disclosure violation into its own extraordinary circumstance. And I agree with your honors on that. But we don't have to. I mean, Ms. Allen was making that argument and I understand why she made it. But we don't have to buy that argument for her to win here. Yeah.  Which was pointed to as an evidence of bad faith. It was merely accurate. At the time that Mr. Rorty died, the last summary plan description was dated 2002. In 2004 when he died, there had been no amendments. And he was noting that in the file. So that's just a – Judge Sleet did nothing with that remark. That's why you don't see anything suggesting that extraordinary circumstances were found. I would point out in the discussion of business trips and whether there's an entitlement to benefit, that was where we opened. It's unclear whether Mrs. Rorty is ultimately entitled to a benefit yet. We submit that she's not entitled on the benefit for the grounds that bring us here today. But it's entirely possible she's entitled to a benefit when this matter, if your honors so decide, remain back to Judge Sleet. That case has now been tried and would need to be looked at in terms of Glenn and Schwing and that progeny of cases because it was decided under the prior law. That's my rebuttal. Okay. And I hope this pleases the court. Hey. Could counsel come up for a second? I'm going to suggest this. Good idea. Everybody come up for a second. Could you turn the microphones off? We can't? No. We can't. That's all right. Sure. That would please the court, too. You're doing really well today. You're doing really well. Now, I think this case has already been through mediation.